United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 11, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-30481

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

          versus

DONALD CRAIG SCROGGINS,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

Before GARWOOD, WIENER and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

     Donald Craig Scroggins appeals his conviction and sentence for conspiracy to possess with the intent to distribute cocaine hydrochloride and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Scroggins was sentenced to life imprisonment and five years of supervised release.  We vacate Scroggins's sentence and remand to the district court for further proceedings as explained below.

## Facts and Proceedings Below

Earl Buchanan, a man informally adopted by defendant Scroggins, was arrested in March 2001 for drug trafficking. A few days after Buchanan's arrest, Scroggins told William Green, a Special Agent with the DEA, that he wanted know how he could help in order to benefit Buchanan. Green testified at trial that over the next few days, Scroggins met with Green multiple times and discussed his previous drug trafficking experience, claiming that he was doing this to assist Buchanan. During this time, Scroggins was already under investigation. Scroggins offered to set up a controlled buy with David Sosa, with whom Scroggins claimed he had been drug dealing since late 1999 and early 2000. Green testified that Scroggins told him that he had purchased one to two kilograms of cocaine from Sosa every two weeks over a period of a few months. Scroggins later told Green that he had set up a ten kilogram cocaine and 200 pound marihuana deal with Sosa thirty days before even speaking with Green and that this was going to be his last deal and that it was going to "set his retirement." Although Scroggins offered and supposedly attempted to set up the deal with Sosa, he was unable to do so. In April 2002, Scroggins was arrested at his home, where officers seized drug paraphernalia.

Scroggins, along with John Calvin Bryant, was subsequently charged in a superseding indictment. Count 1 charged Scroggins and Bryant with conspiring, with each other and with other unnamed

known and unknown persons, from about October 1998 through about March 2001, to possess with the intent to distribute five kilograms or more of cocaine hydrochloride (cocaine powder) and fifty grams or more of cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Count 2 charged Scroggins (alone) with distribution and aiding and abetting the distribution of cocaine powder on or about November 15, 2002, in violation of 21 U.S.C. § 841(a)(1).[1]   At trial, one of the key witnesses against Scroggins was Buchanan.[2]  Buchanan testified that he had been involved in drug trafficking with and for Scroggins from 1998 until Buchanan was arrested in March 2001.  Buchanan testified that Scroggins "financially supplied" the drugs, Buchanan sold the drugs for Scroggins, and they trafficked in both powder and crack cocaine. Buchanan's testimony included amounts of cocaine sufficient for the jury to find that Scroggins had been involved in a conspiracy involving at least five kilograms of cocaine powder and at least fifty grams of crack cocaine.

The jury found Scroggins guilty of count 1 and not guilty of

---

[1]  The remaining two counts of the superceding indicment are immaterial to this appeal. Count 3, which was dismissed on the government's motion prior to trial, charged Scroggins (alone) with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Count 4 charged Bryant (alone) with having been convicted of a felony drug offense in 1983 thus rendering him subject, in respect to Count 1, to enhanced penalties under sections 841 and 851.

[2] By the time of the trial, Buchanan had pleaded guilty to possession with intent to distribute fifty grams or more of crack cocaine and been sentenced to nearly twenty-four years imprisonment.

count 2 and acquitted Bryant. Scroggins then timely filed a motion for new trial, focusing on two witnesses—Freddie Young and James Thomas, confidential informants for the government—who, although subpoenaed by Scroggins, did not show up at trial to testify allegedly because of government interference. At the new trial hearing, these witnesses gave testimony indicating that each had received a telephone call from the government that intimidated them from testifying at trial. They also gave substantive testimony, which essentially would have served to impeach Buchanan and add evidence indicating Scroggins was not a drug dealer. Following the hearing, the district court denied the motion. Scroggins was subsequently sentenced to life imprisonment and five years of supervised release and was given a $100 special assessment.

## Discussion

Scroggins raises several issues on appeal. We address each issue in turn.

### I.  *Inability to Call Two Witnesses at Trial*

Scroggins first argues that the fact that two witnesses whom he had subpoenaed, Freddie Young and James Thomas, did not appear to testify at trial constitutes reversible error for several reasons. Scroggins asserts that such errors include: 1) the district court's denial of his motion for new trial based on either governmental interference with his witnesses or the "interest of justice," 2) the failure of the district court to issue bench

4

warrants compelling the two witnesses to appear, and 3) the ineffectiveness of his trial counsel in failing to seek a continuance following the nonappearance of the two witnesses.

### A. Motion for New Trial

Following trial, Scroggins moved for a new trial pursuant to Fed. R. Crim P. 33, asserting that the government intimidated two material witnesses from testifying. Scroggins asserted in the motion that the "interest of justice" required that he be granted a new trial. The district court treated Scroggins's motion as being based on newly discovered evidence and governmental interference with witnesses, even though Scroggins had not expressly based his motion on newly discovered evidence.[3] The district court then denied the motion, finding that there was no credible evidence that the government prevented either of Scroggins's witnesses from testifying at trial.

On appeal, Scroggins argues that the district court's finding that the government did not interfere with his witnesses is

---

[3] In its memorandum ruling denying the motion, the district court first reviewed the criteria for a motion for new trial based on newly discovered evidence. The district court then declared that "Scroggins has failed to meet his burden of proof as to the first hurdle: Did the government have anything to do with Young and/or Thomas' failure to appear at trial?" While this "first hurdle" is appropriate for the analysis of a governmental interference with witnesses claim, *see United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997), it is not clear why the district court treated Scroggins's motion as based on newly discovered evidence or why it treated governmental interference as the "first hurdle" for a newly discovered evidence claim, particularly when the criteria for such a motion do not require a finding of governmental interference for the motion to succeed. *See United States v. Villareal*, 324 F.3d 319, 325 (5th Cir. 2003)(listing the criteria for new trial motion based on newly discovered evidence).

erroneous. Scroggins further contends that even if the district court was correct in finding that the government did not interfere with the witnesses, his motion still should have been granted based on the interest of justice. Regarding the alleged government interference with witnesses, we disagree with Scroggins and hold that the district court's finding of no interference is not clearly erroneous. Nevertheless, we agree with Scroggins that the district court should have analyzed the motion as being based on the interest of justice and that in appropriate circumstances the district court does not always need to find a specific legal error in order to grant a motion for new trial made in the interest of justice. We therefore remand the case to the district court to analyze Scroggins's new trial motion in the interest of justice.

### 1. *Standard of Review*

We review the denial of a motion for new trial for abuse of discretion. *United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003).

### 2. *Rule 33 Motion for New Trial*

The district court "may . . . grant a new trial if the interest of justice so requires." Rule 33(a). A motion for new trial "is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases . . . ." *United States*

6

*v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997). "Where a court finds that a miscarriage of justice may have occurred at trial, . . . this is classified as such an 'exceptional case' as to warrant granting a new trial in the interests of justice." *Id.* A Rule 33 motion "grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict . . . or within such further time as the court sets during the 7-day period." Rule 33(b)(2).

### 3. Government Interference with Scroggins's Witnesses

Scroggins asserts that the district court's finding that he had not established governmental interference with the appearance of his witnesses, Young and Thomas, is clearly erroneous, and that, since the district court found their testimony material, this court should itself order a new trial. Having reviewed the record, we hold that the district court's finding is not clearly erroneous.

### a. Governmental Interference

The Sixth Amendment guarantees a defendant "the right to present witnesses to establish his defense without fear of retaliation against the witness by the government." *United States v. Bieganowski*, 313 F.3d 264, 291 (5th Cir. 2002) (internal quotations and citations omitted). Further, "the Fifth Amendment protects the defendant from improper governmental interference with his defense." *Id.* "To make a showing that the government has infringed on [these] right[s], the defendant must show that the

7

government's conduct interfered substantially with a witness's free and unhampered choice to testify." *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997) (internal quotations and citations omitted). As the movant, Scroggins bore the burden of proving, by a preponderance of the evidence, that the government substantially interfered with his witnesses and, therefore, that a new trial is justified. *See Thompson*, 130 F.3d at 687; *cf. United States v. Soto-Silva*, 129 F.3d 340, 343 (5th Cir. 1997) (new trial on juror disqualification).

### b. Standard of Review and Credibility Determinations

Even though we review the denial of a motion for new trial for abuse of discretion, *Villarreal*, 324 F.3d at 325, "[b]ecause the existence of substantial interference is a factual question, we may reverse the trial court's decision [that there was no interference] only if it is clearly erroneous." *Thompson*, 130 F.3d at 686–87 (internal quotation and citations omitted). In considering a motion for new trial, "[t]he trial judge may weigh the evidence and may assess the credibility of the witnesses." *Robertson*, 110 F.3d at 1117.

### c. Scroggins's Witnesses

Scroggins argues that Young and Thomas did not appear to testify at trial because of governmental interference. Scroggins asserts that these witnesses would have given exculpatory testimony

8

and would have impeached Buchanan, a key government witness. Nevertheless, even though it had "already determined . . . that the testimony Young and Thomas were to provide [was] material," the district court found that Scroggins failed to prove by a preponderance of the evidence that the government had interfered with the ability of these witnesses to testify at trial[4] and, therefore, denied the motion for new trial. We conclude that this finding is not clearly erroneous.

### (1)Freddie Young

At the hearing on the new trial motion, Young testified concerning actions by Agent Lee J. Scott, a Shreveport police officer working with the DEA, that could potentially be governmental interference with a witness. Young testified that on Tuesday, the day before he was to testify at trial, Scott called him. Scroggins asserts that Scott made three statements that kept Young from testifying: 1) because his subpoena was from the defense, Young did not need to show up to testify; 2) if Young did show up to testify, he would be arrested; and 3) if Young testified in court, he would be prosecuted for perjury.[5]

---

[4] Although there is testimony in the new trial hearing and other evidence that suggest others reasons why Young and Thomas did not show up, the district court did not expressly refer to any of that evidence.

[5] For some reason unexplained by either party, Scott did not testify at the new trial hearing. Scroggins appears to imply that because Scott did not testify, he could not have rebutted Young's testimony. However, following the new trial hearing, the government filed an affidavit from Scott with its brief in support of its response to Scroggins's new trial motion. In his affidavit, Scott stated that he told Young that "if he got a Federal subpoena it would be in his best

Young testified twice during the new trial hearing: on December 19, 2002, and on January 23, 2003.[6] Throughout his testimony, the content of what Young stated varied significantly. While at times his testimony supported a finding of governmental interference, at other times it clearly did not.

### (a) Source of the Subpoena

Young's first discussion of the Scott phone call included no mention of the "who issued the subpoena" discussion. Further, the first time Young was asked about Scott's discussion of who issued the subpoena yielded no clear evidence that Scott suggested to

interest to go to court" and that he never threatened or told Young not to go to court. The affidavit did not make any mention of the "perjury" or the "arrest" warnings. Scroggins did not respond to this affidavit, and the district court did not refer to it in its ruling denying the motion.

[6] On the first day of the hearing, Thomas did not comply with his subpoena and, again, did not appear. Because of Thomas's continued unwillingness to appear, Scroggins was ready to give up on trying to have him testify and was prepared to conclude the presentation of evidence.

As part of its evidence, the government then played a recorded phone call between Scroggins and Bryant, Scroggins's codefendant. The content of their conversation supposedly dealt with Scroggins and Bryant discussing paying Young. The quality of the recording was poor enough that the district court stopped the proceeding and asked the government to make a transcription of the tape. The district court planned to resume the hearing on the following day. Scroggins then decided that if the hearing was to be delayed to make a transcript, he would request a bench warrant for Thomas, which the district court then issued.

The following day, the district court decided to postpone the remainder of the hearing until January 23, 2003. When the hearing continued, Scroggins requested that, if the government decided to play the taped call between Scroggins and Bryant, the district court allow Young to be present and to respond to the tape in rebuttal. The government did play the tape, and Young was allowed to listen to the tape and to again testify.

We note that we have listened to the tape of this telephone conversation, but we have not read the corresponding transcript. Based on the poor quality of the recording and the unclear speech of Scroggins and Bryant, it is very difficult to understand. Although a transcript was prepared for the new trial hearing, and the government refers to the transcript in its supplemental brief, the transcript was not included in the record (the exhibit list for the new trial hearing lists the tape of the phone conversation, but not the transcript of it).

10

Young that he did not need to show up at court if the subpoena was from the defense:

> "[Scroggins's Counsel]: Did Lee J. Scott ever tell you anything about whether or not you got subpoenas from the defense or the prosecutor and what you had to do about them?
> [Young]: He just asked me when I said I got subpoenaed by the defense, well, he said—
> [Scroggins's Counsel]: What did he say after that?
> [Young]: Well, he just told me, he say, 'Well, you ain't get subpoenaed by Liddell [Smith[7]].'
> [Scroggins's Counsel]: By Liddell?
> [Young]: They said, 'You ain't get subpoenaed by Liddell.' And I said, 'I got subpoenaed by defense.' *That was it.*
> [Scroggins's Counsel]: *Did he tell you that if you got subpoenaed by the defense, you didn't have to come?*
> [Young]: *No.* He just told me this—he said, 'You got subpoenaed by the defense or Liddell?' I said, 'The defense.' He said—he just pretty much said, 'Well, you ain't get subpoenaed by Liddell.' He kept saying, 'Well, Liddell didn't do it.'
> THE COURT: Wait. You're going to have to slow down, sir. I'm having difficulty following.
> [Young]: He said, 'Liddell did not subpoena you.' That's what he said.
> [Scroggins's Counsel]: So he said, 'So, if you didn't get subpoenaed by Liddell . . . ,' what?
> [Young]: *He just left it blank*." (emphasis added).

This exchange provides no compelling evidence that Scott led Young to believe—intentionally or unintentionally—that he did not need to respond to a defense subpoena.[8]

---

[7] Assistant U.S. Attorney in the case.

[8] At oral argument, the government suggested that the "who issued the subpoena" discussion was centered around the issue of whether the government had reneged on its promise to keep Young, as a confidential informant, out of court. While the new trial hearing does not establish that that is the reason why Scott and Young discussed who issued the subpoena, just prior to the exchange quoted in the accompanying text, Young testified that the government did not want him to "never get on no stand" and that the reason for this was to protect him and keep

It was not until his January testimony that Young gave any meaningful support to the allegation that Scott told him that he did not have to show up if the defense had issued the subpoena. This time, in response to an unrelated question, Young testified that Scott had told him that because the subpoena was from the defense, he did not have to show up at court; however, this portion of Young's testimony is not a model of clarity or directness and is markedly different from Young's first testimony about the "who issued the subpoena" discussion. While during his second testimony (a month after his first testimony and not contemplated at the time Young concluded his first testimony) Young claimed that Scott told him that "[y]ou ain't got to come . . . because we ain't [issuing the subpoena]," he originally testified that Scott simply said that the government "did not subpoena you" and said nothing more. The differences between the two versions and the lack of a straightforward and clear answer by Young during his second testimony cast doubt over his second version.

### (b)  Arrest Warning

The essence of Scroggins's argument concerning the "arrest warning" is that Scott's phone call was a "veiled threat" that if Young showed up to testify, he would be arrested because of an outstanding warrant with his picture on it waiting for him at the federal courthouse door.  In this case, there actually was such a

_____

his name out of the courtroom.

warrant for Young at the courthouse door.[9]

Young's testimony is clear that he learned about the specific warrant on Wednesday morning, the day *after* Scott's call and the day Young was to testify, from Otis Litton, an employee of the Caddo Parish Sheriff's Department, someone with no apparent connection to Scroggins's case whatsoever,[10] and not from Scott.[11]

Even though Young did not learn about the specific warrant from Scott, he testified on cross examination that Scott stated that he would be arrested if he showed up to testify.[12]  However,

_____

[9] This warrant for Young's arrest was apparently recalled two days after the end of Scroggins's trial.  The warrant was for failure to pay child support, but Young testified that he had never been given any notice of anything about the specific child before his juvenile court date.  When he showed up at juvenile court on Friday (two days after trial) pursuant to the warrant, the judge recalled the warrant.  While this seems suspicious under these circumstances, there was no testimony at the new trial hearing to support a claim that the warrant was fabricated to keep Young from testifying for Scroggins.

[10] Although Litton knew that Young was to go to the federal courthouse on the day in question, there was no testimony as to how Litton knew this.  Young had no idea how Litton knew, and apparently did not ask Litton how he knew, and Litton did not tell Young how he knew.

[11] Young further testified on cross-examination that the existence of the warrant was clear to him on Wednesday, "the day the sheriff came."

[12] Young testified as follows:
"[Gov't]: Was that[, when Otis Litton told you about the warrant,] the first time you learned there was an outstanding warrant for your arrest?
[Young]: That's—the day before, I told you, Lee Scott, I talked to Agent Lee Scott, and he was asking me questions.  Then he told me, he say: 'You got no warrant?  You sure you got no warrant for your arrest?'  I said: 'No.  For what.'  I said, 'It's gonna be something like a city court or something.'  He said, ' You sure?'  He said, 'If you go on the federal property, you will be arrested at the door.'
THE COURT: Wait.  That's slightly different than what you said last time.  Here's what I recall you saying last time: That you talked to the agent—

[Young]: Yes.

THE COURT: —and he asked you whether you had a warrant outstanding for you, and you said no. And he said, 'Are you sure?'

[Young]: Yes.

THE COURT: And then who said what?

[Young]: He said—after then, he said, 'are you sure,' I said—I said, 'Yeah, I'm sure.' And he said, 'Well, if you come on—you come on that federal property, they gonna arrest you.'

THE COURT: Well, did you ask him, 'Arrest me for what?'

[Young]: I asked him for what and he said, 'You sure you got no warrant?' He kept wanting to say that I got a warrant. He won't come out and tell me. He said—and I kept asking the same question. Well, you see, he started laughing. He laughed on the phone and say, 'Well.' Just laughed. He just told me, 'Well.' He just laughed. He started laughing about it. 'Well, you just—you ain't going'—something like—then—sound like he just said—I asked him, I said, 'I gots to go.' He said, 'Just—well, you just ain't gonna—you sure? Check and see.' He said, 'Check and see,' and he started laughing. I said, I ain't got no warrant.' And he told me, he said, 'Well, you got a warrant, you won't make it on the federal property; at the door you will be arrested.'

THE COURT: All right. He said, '*If you have a warrant, you will be arrested at the door*'?

[Young]: *Yes.* He—

THE COURT: Is that what he said?

[Young]: *More like he saying that he knowed I had a warrant and I was gonna be arrested.* Point blank, he was saying I was gonna be arrested if I come at the door. He said I was gonna be arrested. His exact words: I'm gonna be arrested, if I come to court, at the door. And I kept asking for what.'

[Gov't]: You realize that's different from what you testified to earlier?

[Young]: Yes, but it was more like he saying that I'm a be arrested, if I come to court, at the door.

[Gov't]: Do you remember exactly what he said?

[Young]: Yes. The day when he called, he said—he said—at first, he asked about John Bryant. He said, 'You have anything—do you know a John Bryant? John Bryant paid you any money?' I said, 'No.' He said, 'You sure?' I said, 'No.' I said, 'John ain't—John Bryant gave me nothing.' He said, 'Well.' I said, 'You know I got to come to court, Agent'—I told Lee Scott, 'You know I got to come to court.' He said, 'Well, you got no warrants for you?' I said, 'No.' He say, 'Well, you sure?' I said, 'No, I ain't got no warrant.' I say: 'If I got one, it's probably one in the city court. That ain't nothing.' He say, 'Well, I tell you, you go on the federal prop—on that federal building, at the front door, you go on the property, you will be arrested at the door.' He said: 'You will be arrested. You gonna be arrested at the door and you ain't gonna make it up there anyway,' and

14

as pointed out by the government and the district court during his testimony, Young's testimony changed somewhat from the first time he talked about the Scott phone call in his direct examination.  On cross examination he added: Scott's persistent laughing about the potential arrest, Scott's statement that "you ain't gonna make it [to the courthouse] anyway [to testify]," Scott's knowledge of a specific warrant for Young's arrest, and Scott's insistence that Young *would* be arrested *if* he showed up to *testify*—not just if he had an outstanding warrant.  Nonetheless, even with these changes, Young twice confirmed during cross examination that Scott's warning was conditional on there being an outstanding warrant, not merely on whether Young testified.[13]  Young also did not testify that Scott told him about the specific warrant, but only that Young *believed*

---

laughed about it.
[Gov't]: So is it your testimony now that he never said 'if you have a warrant, you will be arrested,' is that correct?
[Young]: No, he was letting me know, yeah, I'm a be arrested.
[Gov't]: My question is: Is it your testimony that he did not say to you '*if you have a warrant, you will be arrested*'?
[Young]: *He said that.*
[Gov't]: He said that?
[Young]: *Yeah.  'If you had a warrant, you will be arrested.'*" (emphasis added).

[13] Young confirmed again on cross-examination during his second testimony that Scott's arrest warnings were conditional—you'll get arrested *if* you have a *warrant* outstanding.

Young had difficulty speaking of the warrant/arrest in conditional terms.  He generally spoke of the possibility of arrest as being conditional upon his testifying in court, but always confirmed, when asked by the government or the court, that his arrest was conditional upon there being an outstanding warrant for his arrest.  Moreover, on at least two occasions Young directly testified, rather than just merely confirmed, that Scott stated that the potential arrest was conditional upon the existence of an outstanding warrant.

15

that Scott knew of the warrant.

In spite of Scroggins's contentions, Young's testimony supports the following findings, none of which favor a finding of governmental interference: 1) Scott never expressly stated that he *knew* of a *specific* warrant for Young's arrest; 2) Scott's arrest warning was conditional on the existence of an *outstanding warrant* for his arrest; and 3) Young learned of the specific warrant for his arrest after Scott's call and from a person not shown to be connected with the federal government or Scroggins's case.[14]

### *(c)   Perjury Warning*

Young's testimony in December made no mention at all of any "perjury warning" from Scott.  That testimony did not come up until Young's January testimony.  Young then brought this issue up in response to an unrelated question:

> "[Scroggins's Counsel]: So the only one that told you you didn't have to come if the defense subpoenaed you was Lee J. Scott?
> [Young]: Yeah, because he told me on the phone that—started laughing, saying, 'The DA gonna get you for perjury.'  I said, 'Perjury for what?'  He talk about, 'How much money John paid you?'  I told him, 'John ain't paid me nothing.'  And he said: 'Ha.  Ha.  You sure?'  I said, 'Yeah, I'm sure.'  Exact words, he said, 'They'll get you for perjury.'
> [Scroggins's Counsel]: And did he tell you about the

---

[14] As Young testified that no other agent called and told him about the warrant until after the trial was completed, the allegation of governmental interference hinges on the Scott phone call alone—unless the actions of Litton can somehow be attributed to the government.  The district court flatly rejected the suggestion that Litton's actions could be part of the alleged governmental interference.  On appeal, Scroggins does not argue that Litton's actions should be attributed to the government, and we see no evidence in the new trial hearing suggesting as much.

tape?[15]
[Young]: No.  He told me that they were gonna get me for perjury.  He said, 'Liddell gonna get you for perjury.'
[Scroggins's Counsel]: Did you ask him why?
[Young]: I kept asking him why.  He wouldn't tell me.  But he told me—he said that's what gonna happen.  He kept telling me that's what gonna happen, you know, they gonna get me for perjury.  He wasn't telling me about the tape, but he said, 'They gonna get you for perjury.'"[16]

Young later confirmed, however, in response to questioning by the district court and the government, that the perjury warning was conditional—*if he lied*, he would get prosecuted for perjury:

"[Gov't]: So did Lee Scott tell you anything else other than if you had a warrant, you'd be arrested?
[Young]: And about you, you gonna get me for perjury.
[Gov't]: *If you lied?*
[Young]: *Yeah*.  And he said—nah, he said something like—he said, 'How much money John [Bryant] paid you?'  I said, 'John ain't'—
THE COURT: What?
[Young]: He said, 'How much money John Bryant paid you?'  I said, 'John ain't paid me no money.'  And I—I explained to him and told him, and everybody know I worked on Donnie's company at A-1 Painting.  Even Agent Will Green know that.  I worked with Donnie [Scroggins].  And I told him Donnie owe me money right then, because I supposed making—Donnie got put off the job at Fairgrounds Stadium.  We did Independence Stadium.
THE COURT: Wait a minute.  Wait a minute.  Stop.  All you

---

[15] Referring to the recorded conversation between Scroggins and Bryant in which they discussed Bryant paying Young. *Supra* note 6.  Young claimed that Bryant never gave him any money and that the money referred to in the recorded conversation must have been money Scroggins owed Young for painting work Young had done for Scroggins.

[16] Later testimony by Young concerning the perjury warning is somewhat unclear about when Scott may have given the warning, or if Young even received the warning from Scott as opposed to from someone else.  Young testified that Scott told Mary Winchell, Bryant's defense counsel, that the government would prosecute Young if he testified, and that Winchell told Bryant, who then told Young.  It is not clear, however, if this exchange of information among Scott, Winchell, Bryant, and then Young occurred before or after Young's alleged conversation with Scott.

got asked was how much money—*you'd get prosecuted for perjury if you lied?*
[Young]: *Yes.*" (emphasis added).

That the perjury warning testimony did not come up at all until Young's January testimony and that Young confirmed that the warning was "if he lied," raises meaningful questions about the testimony and the effect of the warning on Young's decision not to appear at court.

### *(d) Conclusion*

The district court found that "there is no credible evidence that the prosecutors had anything to do with Young's failure to appear to testify at trial."[17] The district court specifically found that Young's interpretation of the alleged conversation with Scott about who issued the subpoena was "not credible" and most likely came from a "misunderstanding on Young's part."[18] It also found that Scott did not discuss or mention the warrant with Young. Although the district court did not make a specific finding as to Scott's supposed perjury warning, the finding of no credible

---

[17] Even though the district court limited its finding to the "prosecutors," and questioned whether Scott's actions could be attributed to the federal government, it did assume that Scott's actions could be so attributed. Further, during oral argument, the government conceded that Scott was the government for the purposes of this case. Therefore, we treat the district court's finding as including Scott's actions within the potential government interference.

[18] In his affidavit, filed with the government's brief in support of its response to Scroggins's new trial motion, Scott stated that he told Young that "if he got a Federal subpoena it would be in his best interest to go to court" and that he never threatened or told Young not to go to court. This directly supports the district court's finding that Young's interpretation was not credible and was a misunderstanding on his part.

18

evidence of governmental interference sufficiently indicates that it did not find this allegation to be credible.

The district court's determination that it was not shown by a preponderance of the credible evidence that the government caused Young's failure to appear is not clearly erroneous. The nature and content of Young's testimony—adding more information during his January testimony, being somewhat inconsistent in relating the content of the conversation, confirming the government's version of events, but continuing to repeat the defense's version—support the district court's determination that Young's account was not credible and that at the least he misunderstood Scott. Further, Young's testimony clearly reflects that he simply did not want to get involved in the case by testifying.[19]

Concerning the perjury warning, Scroggins relies on *United States v. Vavages*, 151 F.3d 1185 (9th Cir. 1998). In *Vavages*, the Ninth Circuit held that a statement that in effect told the witness that if she testified, she would be prosecuted for perjury constituted government interference with the witness:

---

[19] Young testified as follows:
"[Scroggins's Counsel]: Mr. Young, were you fearful about coming here today to testify against the government?
[Young]: I don't like it.
[Scroggins's Counsel]: Why don't you like it?
[Young]: Because I been with them a long time, and coming into court just ain't me. I just like doing my job and I don't like being here."
Young's testimony also suggests that it would not be safe for him, as a confidential informant, to testify in court, giving him a motive to avoid testifying. Young testified that the government previously had wanted, and had tried, to protect him by keeping him and his name out of court.

> "The prosecutor combined a standard admonition against perjury—that Manuel could be prosecuted for perjury in the event she lied on the stand—with an unambiguous statement of his belief that Manuel *would be lying* if she testified in support of Vavages' alibi. . . . It does not require much of an interpretative gloss on the prosecutor's warning to conclude that unless Manuel changed her testimony or refused to testify at all, she *would* be prosecuted for perjury and suffer any attendant consequences." *Id.* at 1190.

It is not the law that the "government cannot tell a witness of the consequences of committing perjury." *Thompson*, 130 F.3d at 687. So far as Scott merely informed Young of the consequences of lying, that is not improper:

> "Granted, the government told the witnesses that they had to testify truthfully and, if not, they would go to jail. That procedure, however, *even if carried out in a caustic manner*, is no cause to dismiss the indictment against the defendants. There is nothing wrong with the government informing witnesses of the consequences of breaking the law." *Id.* (emphasis added) (internal quotations and citations omitted).

Because we believe that the district court found that Young's perjury warning story was not credible and because this finding is not clearly erroneous, *Vavages* is distinguishable.[20]

---

[20] Moreover, the Ninth Circuit explained that it was not saying that "a prosecutor should *never* articulate his belief that a witness is lying." *Vavages*, 151 F.3d at 1190. "[U]nusually strong admonitions against perjury are typically justified only where the prosecutor has a more substantial basis in the record for believing the witness might lie." *Id.* Because the testimony that the witness in *Vavages* would have given "would have been entirely consistent with her own prior statements and would not have conflicted with any past testimony, the prosecutor lacked this substantial basis for believing [the witness] would perjure herself." *Id.* at 1191. In contrast, Scott likely did have a substantial basis for believing that the Young might lie. While it is not clear, Scott's conditional perjury warning, if it happened at all, may have occurred in the following context: 1) the recorded conversation between Scroggins and Bryant potentially discussing Bryant paying Young; 2) Scott may have known of the recording; 3) during the conversation with Scott, Young denied that Bryant had paid him any money; and 4) Scott responded by saying that if he

20

In addition to the reasons given thus far for sustaining the finding of no governmental interference, Young's testimony also supports a finding that Scott's call did not intimidate Young enough to keep him from going to court. The day after the discussion with Scott, and the day he was to testify in court, Young was in a discussion with Litton of the sheriff's department concerning his outstanding warrant. According to his discussion with Litton, Young *still planned to go to court*—in spite of the

---

lied (about the money he received from Bryant), he would be prosecuted for perjury. Thus, it appears that Scott's conditional perjury warning was justified.

We note, however, that there is no direct evidence in the record that Scott had listened to or knew of the recorded conversation. Even though Scott asked Young whether Bryant had paid Young, and then supposedly followed up with the perjury warning, he did not tell Young that he knew of the recording nor did he expressly explain to Young what possible perjury he was speaking of. Agent Green testified that he had listened to the recording, but never stated that he had passed the information or the recording on to Scott.

Scroggins also contends that the district court discounted the effect of the tape. The government claims that the taped conversation indicates that Scroggins and Bryant may have paid or offered to pay Young to testify, giving an explanation for Scott repeatedly asking Young if Bryant had paid him. Scroggins responds by pointing out that the district court stated during the new trial hearing that it "didn't find anything in [the transcript of the tape] to hurt [Scroggins's] motion" and that it knew that the tape would worry Scroggins, but that it did not worry the district court.

The district court's comments about the tape, however, do not diminish the fact that the tape may have given Scott a substantial basis for believing that Young would lie. The court's comments came *before* Young accused Scott of the perjury warning and *before* it became apparent that the tape may have created a basis for Scott's belief concerning the likelihood that Young would lie. Further, even if the tape does not establish that Scroggins and Bryant attempted to pay Young to testify, it still may have led to Scott's substantial basis for believing Young would lie at trial: the tape talked of Bryant paying Young, Scott asked Young if Bryant had paid him, and Young denied that Bryant had paid him. This establishes a basis for Scott then telling Young that he would get prosecuted for perjury if he lied—assuming Scott knew of the tape.

21

Scott phone call that he had already received.[21]  Young's testimony

clearly supports a finding that it was the discussions with the

sheriff's department, not the discussion with Scott, that persuaded

---

[21] The following exchange makes it apparent that Young was still willing to go to court after talking to Scott:

"[Young]: I asked and Otis tell me there.  So I said, 'Okay, Otis, I'll be down there [at the sheriff's department].'  So I ain't—I called him back again.  I said, 'Otis, *you know I supposed to be in—in court*.'  Then he says: 'Yeah, I know that, but you come [to the sheriff's department] first.  I'm gonna walk you through the process of the other court system where you got to go for this warrant, then you can take care all of that.'  And I said—
THE COURT: Take care of what?
[Young]: Take care of my other business.  And I say, 'Otis'—I asked him, I said, 'Otis, you sure?'  He said.  'Yes.  Just come down first.'  I said, *'No (indiscernible).'  I said, 'Let me go over to the courthouse first.'*
[Scroggins's Counsel]: Excuse me.  When he said 'you come down here first,' what do you mean?  First before what?
[Young]: Come to the Caddo Parish Sheriff Department building down there.  He said come downstairs, he gonna be down there waiting on me and he gonna take me in court and walk me through the little—where the warrant was suppose to be at.  Then I told him, I said, 'Otis, *why can't I go to the other court first?'*
[Scroggins's Counsel]: What do you mean by 'the other court'?
[Young]: *The federal court*.
[Scroggins's Counsel]: Okay.  You asked—
[Young]: *The federal court*.
[Scroggins's Counsel]: —him why you couldn't go to federal court first?
[Young]: Yeah.  And when—he said, 'Okay, then.'  I said, 'Okay.'  So I—I waited a little while again, so I called Otis one more time.  Otis said—
THE COURT: Wait.  Otis said okay, *you can go to the other court first*?
[Young]: *Yeah*.  He went on—he went on and said it.  But when *I got ready to come* and decide to call him again, Otis told me, 'You ain't been over there.'  I said, 'How you know?'  He say: 'Because they got your picture out at the front door.  They gonna arrest you, anyway, you come in there.'  I said, 'They gonna arrest me for where, at the federal courthouse?'  He said: 'Yeah.  You was gonna be arrested at the door and you never would have made it to the court.'  And then that was left at that.  That's what was said right there out of me and Otis."
(emphasis added).

22

him not go to federal court because of his fear of being arrested.[22]

In summary, we are unable to conclude that the district court's finding with respect to Freddie Young and governmental interference is clearly erroneous.

### (2) James Thomas

---

[22] In spite of the testimony cited in the preceding footnote, Young then testified that Scott's call did have some part in his decision not to show up at court. Nevertheless, in light of Young's testimony up to this point, the phrasing of the question, and Young's answer, this testimony is less than convincing:

> "[Scroggins's Counsel]: So because of what Mr. Otis Litton and Mr. Lee J. Scott, narcotics agent, told you, did that make you afraid to come to court?
> [Young]: Yes. I wasn't coming. I wasn't coming after that.
> [Scroggins's Counsel]: Were you afraid to come?
> [Young]: Yes, because I wasn't gonna be—I was afraid I was gonna be arrested on that day."

The question and the answer do not distinguish between Scott's and Litton's actions and their separate effect on Young. That Litton's calls, not Scott's, were primarily responsible for Young's nonappearance was made apparent on cross-examination of Young:

> "[Gov't]: What day was it that you decided you—did you decide you were not coming to testify after all?
> [Young]: *I was coming*. Only day that I wasn't coming—*after the sheriffs came to my house, I wasn't coming then*. That day I found out that I got a warrant down here at the door, that I was gonna be arrested, I wasn't coming." (emphasis added).

The conclusion that Scott's call did not intimidate Young from coming to trial also has some support from the trial record. On the last day of trial, Wednesday, September 25, Scroggins's counsel told the district court that: three witnesses whom she had subpoenaed had not appeared, she had spoken to two of them on Tuesday night, and the third was not responding. The third witness, the one not responding, was Thomas. Therefore, Young must have been one of the other two nonappearing witnesses.

Scroggins's counsel, therefore, apparently spoke to Young *after* Scott's call but before Young was to testify. There is no indication from the record that on Tuesday night Young told Scroggins's counsel about Scott's call or about the effect that the call allegedly had on him. If Scott's call had intimidated Young from testifying, presumably Young would have told Scroggins's counsel about this when she spoke to him on Tuesday night. While this is not conclusive of what Scott may have told Young or the influence of the call on Young, it is consistent with the conclusion that something other than Scott's call influenced Young's decision not to testify.

Before Thomas was to testify at trial, he received an anonymous message supposedly from law enforcement stating that if he showed up at the courthouse to testify, he would be arrested. Scroggins contends that this call constituted governmental interference with a witness.

### *(a)  Testimony*

Early in the morning of Tuesday or Wednesday,[23] Wednesday being the day he was to testify, Thomas received a voice mail on his cell phone from a number with a 676 prefix.  Although the call came in the morning, he did not check his messages until the night of the call.  The message told him of a warrant for his arrest waiting at the federal courthouse.[24]  Thomas did not save the message.

Thomas also testified that the DEA agents with whom he had worked had contacted him before on his cell phone.  He had given his number to five different agents, three of whom had called him on his cell phone (Russell Sarpy, Green, and Scott); the agents'

---

[23] Thomas stated at least twice that the call came either Tuesday or Wednesday morning; however, Thomas later testified that he received the voice mail Tuesday morning, but that he did not review his messages until Tuesday night.  If the call came Wednesday morning and if he did not check his messages until Wednesday night—after trial was already over—then the call would be completely immaterial as to his decision to not testify.  Overall, his testimony does tend to support that the call came on Tuesday, not Wednesday.

[24] Thomas testified that the message told him "not to come to court because it was a warrant down here for my arrest and I'd be arrested before I walked through the door" and that the message said "'don't step foot on the federal property.'"  Thomas also testified that the message talked about "something like an assault and battery charge" and that the warrant would be at the front door of the federal courthouse with a picture.

calls came from a 676 number.[25]  Thomas's testimony indicates these three agents were the only agents who had called him and that the only calls he received from a 676 number were from narcotics agents.  Nevertheless, Thomas did not recognize the voice on the message and could not say that it was from any of the agents to whom he had talked.  He also did not know that the call was from a narcotics agent; he merely testified that the call "sounded like a law enforcement" because "who else would call [him] and tell [him] something like that?"  Therefore, his belief that the call was from "law enforcement" was based on the 676 prefix and the argument that "who else would have done it?"

Thomas later testified that on Tuesday night, after he had heard the message, he spoke to the secretary to Victoria Cranford, Scroggins's counsel, to tell Cranford about it.  Cranford never called him back; however, Thomas could not recall if he specifically told the secretary about the mysterious message.[26]  On Tuesday evening Thomas also called and left a message on the answering machine of David Shanks, the defense team's investigator; however, he could not recall what, if anything, he specifically

[25] Thomas testified that "[s]ometimes [the calls] used to be three different numbers, but I just remember 676-48 I think."

[26] Elsewhere Thomas testified that he called Cranford on Wednesday and left a message with the secretary for Cranford to call him.  He did not testify as to the content of his message—i.e., whether he told the secretary about the mysterious phone call.  No one returned his call.  It is not clear whether this call (on Wednesday) is different from the call described in the accompanying text (on Tuesday) or if Thomas was simply mixing up his days again and forgetting when the calls occurred.  Thomas did testify that he had "problems with long-term memory."

25

told Shanks about the call. Shanks also did not call him back. Therefore, it is unclear whether Thomas specifically told anyone of the call before the end of trial.[27]

Thomas testified that after receiving the message, he decided not to show up to testify because of his fear of being arrested and being "messed over"—being put in a situation that he could not get out of—by the government.

Nevertheless, in spite of Thomas's testimony that he did not show up at trial at least in part because of the phone call,[28] it appears that *he was already very reluctant* to show up. Thomas simply did not want to get involved in the case:

> "[Gov't]: And why did it take you so long to go down and talk to [Scroggins's counsel before trial]?[29]
> [Thomas]: *Because I really didn't want to get involved*.
> [Gov't]: And why didn't you want to get involved?
> [Thomas]: Because I just didn't want to—after all—after I did that last buy [with Earl Buchanan][30], I just wanted to put it all behind me." (emphasis added).

Thomas eventually decided to go to the office of Scroggins's counsel about one week before trial. Thomas also appeared at the

---

[27] Thomas did testify that on Thursday or Friday of the same week—after the trial was over—he did speak with Cranford and told her about the call.

[28] When asked by the government what helped him to make his decision not to show up, Thomas replied: "Probably everything. Really, the government, that phone call, and just—two factors, I guess you can say."

[29] Thomas testified that it had taken him a long time to go and talk to Scroggins's counsel after she had contacted him about testifying.

[30] Thomas was the government's confidential informant in a controlled buy with Buchanan in November 2000.

office of Scroggins's counsel on Monday, the first day of trail, and was told to go to the courthouse on Wednesday to testify.

Even though Thomas appeared at the office of Scroggins's counsel on Monday, his testimony supports a finding that he did not plan to go to court—independent of the anonymous phone call. In his testimony, Thomas *volunteered that he was not going to show up anyway* because he did not want to get involved. It was only after persistent and lengthy questioning by the district court that Thomas did state again that the phone call had contributed to his decision to not appear at court:

> "[Gov't]: When did you become afraid of the police?
> [Thomas]: When I started hearing [the mysterious message], that was enough for me not to come, period.
> [Gov't]: And how long—
> [Thomas]: *I wasn't—anyway, I wasn't planning on coming anyway, because I really didn't want to get involved.*
> [Gov't]: So—
> THE COURT: Excuse me. Say that again?
> [Thomas]: *I was not going to come anyway, because I really didn't want to be involved.*
> [Gov't]: Have you ever been threatened by Mr. Scroggins or any of his family member?
> [Thomas]: No, sir.
> [Gov't]: Did you ever tell agents that you had been threatened by—
> THE COURT: Okay, stop. I'm going to explore it. If you're not going to, I'm going to.
>     *You said you were not going to come anyway, because you didn't want to be involved?*
> [Thomas]: *Yes, sir.* When I—when I made that deal—
> THE COURT: What deal?
> [Thomas]: With Russell Sarpy. The deal was that I wouldn't have to testify in court.
> THE COURT: Okay. But we're talking about coming to the trial and testifying.
> [Thomas]: Yes, sir.
> THE COURT: Are you telling me that you were not going to come to testify whether or not somebody called you and

27

told you that you were going to be arrested if you did come? Did you follow that?
[Thomas]: Sir?
THE COURT: Did you understand the question?
[Thomas]: Say—repeat the question.
THE COURT: Okay. You just told me that you were not going to come to testify anyway. *What I'm trying to find out is whether or not this phone call that you got from the 676 number had anything to do with your not coming.*
[Thomas]: *No*. That Monday I came, and she told me to come back. She was going to call me to come back that Wednesday. *But when I got that phone call, I wasn't going to come, because I didn't want to be involved.*
THE COURT: Okay. What I'm trying to find out is: Had you decided not to come before you got that phone call—
[Thomas]: No, sir.
THE COURT: —or did that phone call cause you to decide not to come?
[Thomas]: Yes, sir. That Monday I did come to trial.
THE COURT: "Yes, sir," what?
[Thomas]: I came to trial that Monday[31] before I got the phone call, but that phone call made me not come no more.
THE COURT: That's what I want to know, because you just said that you were not going to come anyway, and *I want to make sure that it was the phone call from the 676 number that caused you not to come. Is that correct*?
[Thomas]: *Yes, sir*.
THE COURT: All right." (emphasis added).

Even though Thomas eventually confirmed that the phone call caused him not to come, he never disavowed his voluntary statement that he "was not going to come anyway," even before he received the call. It is very questionable whether Thomas would have shown up at court even without the mysterious message.

---

[31] Thomas talks about coming to trial on Monday, but his previous testimony is that he merely showed up at the office of Scroggins's counsel. While it is not clear if Thomas was thinking of his appearance at the attorney's office or some separate appearance at the courtroom, we assume that it is the former. The statements of Scroggins's appellate counsel at oral argument support this assumption—he admitted that the witnesses showed up at the office on Monday, but made no mention of either of them showing up at trial.

Moreover, Thomas's behavior with respect to the new trial hearing also makes it apparent that he was very reluctant to get involved by testifying at trial.  When Thomas was subpoenaed for the new trial hearing, again he did not show up—even though there was no evidence of a continued risk of being arrested at the federal courthouse because of some supposed warrant.  Thomas finally came to the new trial hearing because he was arrested for not complying with his subpoena to appear at the hearing on the previous occasion.[32]  Although he was still afraid of the government,[33] he now knew that he had to comply with the subpoena or be arrested.[34]  This testimony supports the government's contention that Thomas had other reasons for not appearing at

---

[32] The day Thomas did not show up at trial was September 25, 2002.  The first day of the new trial hearing was December 19, 2002.  Thomas did not show up then; he finally appeared on January 23, 2003.

[33] Thomas was afraid of retaliation from the government if he showed up to testify:
"[Thomas]: I told [Cranford and Shanks] about the phone call and I told them I was afraid because I really didn't—I was—I was scared, scared of the government, scared they will try to do something to me if I came and showed up here.
[Gov't]: And what were you afraid they were going to do to you?
[Thomas]: Anything.
　　　　　　　　　　* * *
[Thomas]: A lot of stuff went through my mind.
[Gov't]: What were you afraid that they were going to do to you?
[Thomas]: Try to set me up; anything.
[Gov't]: They were going to set you up for coming to court?
[Thomas]: Yeah.
[Gov't]: Did anybody from the government tell you that?
[Thomas]: No, sir."

[34] Thomas testified that he did not understand that he could get arrested for not obeying the subpoena—until he got thrown in jail.

29

trial.[35]

### (b)  Conclusion

The district court found that there was "no credible evidence that the Government prevented Thomas from testifying" at Scroggins's trial. The court observed that the "evidence surrounding Thomas' voice mail message is insufficient to implicate interference by the federal government as there is no evidence that the federal government corners the market on the '676' prefix in Shreveport, Louisiana." The court considered that Thomas did not recognize the voice of the caller and could not identify it as belonging to any agent who had called him and whose voice he likely would have recognized. Because the district court found that there was *no credible* evidence of governmental interference, it apparently did not believe Thomas's testimony that the mysterious call had occurred in the manner that he testified—if at all.

The district court did not clearly err in finding that Thomas had not shown by a preponderance of the evidence that the mystery call was from the government: Thomas did not recognize the voice as belonging to any agent who had called him on his cell phone and

---

[35] Thomas's testimony of why he did not show up at the first new trial hearing showed his "pattern" of deciding not to show up at court. When asked if he had told Scroggins's team if he was not coming to the first new trial hearing, Thomas stated: "I told them I was afraid. I ain't tell them I was coming, because I had got up to come, *but I just turned around and changed my mind*." (emphasis added).

with whom he had spoken and whose voice he recognized;[36] there was no evidence given during the new trial hearing or otherwise that the government "corners the market on the '676' prefix in Shreveport;"[37] and Thomas did not know if the call was from a narcotics agent, but only assumed it was because "who else would have done it?"

Furthermore, what is most damaging to Thomas's allegations is his testimony that he had *already decided* not to go to court anyway—*independent of the call*—because he did not want to get involved and because of his fear of the government. Thomas's fear of the government developed prior to and independent of the claimed phone message. Although he did assert that the phone call did contribute to his decision to not come, he also stated that *he was not going to come anyway*. Thus, it is difficult to conclude that but for the alleged phone call, Thomas would have appeared at trial, particularly in light of Thomas's failure to appear at the new trial hearing until he was arrested—even though there was no evidence of any threat preventing him from appearing at that time.

---

[36] Thomas had spoken with Sarpy and Green several times, but was not asked about Scott's voice and how many times he had heard Scott speak.

[37] Scroggins's counsel stated during the new trial hearing that "676 is only a government prefix number, Your Honor." Nevertheless, the district court was correct that there was no *evidence* given about the 676 prefix and the government's share of such numbers—either during the new trial hearing or after. Further, Scroggins did not request that the district court take judicial notice of the 676 prefix and no motion to take judicial notice on the issue has been filed before this court.

Other evidence at the new trial hearing also explains why Thomas would have been reluctant to appear at trial—independent of the mysterious call. Green testified that Thomas had been threatened in the past by the Scroggins family and that he came to the agents requesting money or protection and that they get him out of the Shreveport area.[38] In addition, along with its brief in support of its response to the new trial motion, the government filed an investigation report that purportedly detailed a payment to Thomas for security purposes because of threats from the Scroggins family. The report stated that: threats were made against the "CS's"[39] life as a result of cooperation with the DEA during October and November 2000; the payment was for security purposes and was to assist the CS in leaving the area because of the threats; and at least some of the threats were from Donald Scroggins and were due to the CS's involvement in the arrest of Buchanan. Adding this evidence to Thomas's testimony about his reluctance to show up at trial and his not appearing at the December new trial hearing, the district court did not clearly err in finding that the government did not prevent Thomas from

---

[38] Green testified that according to his recollection, the agents gave him money to leave the Shreveport area. Thomas testified, however, that the government was "supposed to pay me some money and got me out of Shreveport, but they never did do that."

[39] The report omits the name of the subject, who is referred to as the "CS." Although there is nothing in the report specifically stating that the CS is Thomas, the facts in the report are consistent with Green's testimony and Thomas's involvement in the events leading to the arrest of Buchanan.

appearing at trial.[40]

### 4.    *Interest of Justice*

We next consider whether the district court erred by not considering the primary basis of Scroggins's new trial motion—the interest of justice.  We hold that the district court did err in limiting its analysis of the motion to newly discovered evidence and that this error was not harmless to Scroggins.  We also reject the government's argument that the district court may not grant the new trial motion absent an identifiable legal error and hold that the existence of a specific legal error is not always required to grant a motion for new trial in the interest of justice.

### a.    *Proper Standard for Analyzing New Trial Motion*

---

[40] There is also evidence that would tend to question Thomas's credibility.  It is questionable that Scroggins's team did not return Thomas's calls on Tuesday, particularly when Scroggins considered Thomas to be such an important exculpatory witness.  Granted, because Thomas could not recall if he had told the defense team about the mysterious message, Scroggins's team may have received his nonspecific messages and not felt a need to respond to Thomas quickly to make sure that he would be in trial on Wednesday to testify.  We also note that Thomas's testimony is potentially inconsistent with what occurred at trial.  When Thomas did not show up at court, Cranford, Scroggins's counsel, said that even though she had "subpoenaed him, paid his witness fees, done everything properly, [Thomas was] not responding" to her voice mails.  Therefore, we have testimony by Thomas that he left messages for Cranford and Shanks on Tuesday, to which they did not respond, and a statement by Cranford that she had left at least one message for Thomas, after he had met with her on Monday and before Wednesday morning, to which Thomas had not responded.  While it is possible that both statements are correct—*i.e.*, that Thomas did not receive Cranford's message and that Cranford did not receive Thomas's message—it casts some doubt over whether Thomas even called Cranford and Shanks or whether Scroggins's team diligently tried to locate Thomas.

Thomas himself also stated that he had "problems with long-term memory," perhaps giving the district court another reason to question his credibility.

Because Scroggins filed his motion for new trial within the time authorized by Rule 33(b)(2), his motion could have been properly grounded on *any* reason for which a new trial could be granted and was not required to be limited to newly discovered evidence.[41]  Scroggins based his motion on the interest of justice and not expressly upon newly discovered evidence.[42]  Therefore, the

---

[41] The jury verdict against Scroggins was filed on Thursday, September 26, 2002.  On Friday, October 4, 2002, less than seven days after the verdict, the district court extended the deadline for filing a motion for new trial to October 16, 2002.  *See* FED. R. CRIM. P. 45(a)(2) (in computing time periods, "[e]xclude intermediate Saturdays [and] Sundays . . . when the period is less than 11 days").  Scroggins timely filed his Rule 33 motion on October 16, 2002.  The government agrees that Scroggins's motion was in fact filed within the properly extended time.

[42] Scroggins mentioned "newly discovered evidence" in two portions of his documents supporting his motion for new trial.  First, he referred to newly discovered evidence in reviewing a case, *United States v. Ouimette*, 798 F.2d 47 (2d Cir. 1986), that he claimed supported his motion.  In *Ouimette*, a witness favorable to the defense was allegedly intimidated by the police to recant his proposed testimony and flee from the area, making him unavailable to testify at trial.  Later, the witness returned and gave a sworn statement to the defendant reiterating his original testimony and describing how the police had threatened and harassed him, causing him to flee.  Apparently more than seven days after the verdict, the defendant moved for a new trial based on newly discovered evidence, using this sworn statement of the witness as the primary support.  *Id.* at 51.  While the Second Circuit held that the witness's testimony was not newly discovered evidence—since the defendant had known about the supposedly exculpatory testimony prior to trial—it did hold that the "assertion concerning the pressure put on [the witness] by the . . . police to dissuade him from testifying for the defense is certainly new in the sense that it was discovered after trial."  *Id.*  The Second Circuit then remanded the case for further findings to determine if the defendant had met the other requirements for a motion based on newly discovered evidence, primarily whether the defendant had exercised due diligence.  *Id.* at 52.

Scroggins's reference to *Ouimette* is not enough for the district court to conclude that his motion was based on (or only on) newly discovered evidence.  In contrast to *Ouimette*, as Scroggins's motion was filed within the Rule 33(b)(2) time limit, it was not required to be limited to newly discovered evidence.  The defendant in *Ouimette* was limited to evidence concerning interference with the witness since the direct exculpatory evidence was not newly discovered and the motion for new trial had to be limited to newly discovered evidence.  Further, none of the arguments in any of Scroggins's documents supporting the new trial motion or in the new trial hearing suggest that Scroggins was *primarily* interested in the evidence of the government's interference with Thomas and Young as opposed to the substance of their supposedly exculpatory

34

district court erred in limiting its analysis of the motion, and the exercise of its discretion, to newly discovered evidence while not considering the primary basis of Scroggins's motion—the interest of justice.[43]

Further, the district court's failure to analyze the motion based on the interest of justice was not harmless to Scroggins.[44] In contrast to motions made within the seven-day period, new trial motions based on newly discovered evidence are subjected "to an unusually stringent substantive test." *United States v. Ugalde*, 861 F.2d 802, 808 (5th Cir. 1988). *See also United States v.*

---

testimonies.

Scroggins also stated in his brief in support of his motion for new trial, requested by the district court at the end of the new trial hearing, that he "now requests, *in the alternative*, that [he] be granted a new trial on the grounds of newly discovered evidence as well as government misconduct." (emphasis added). It appears that the newly discovered evidence Scroggins refers to here is not the substance of Thomas's and Young's testimonies, but rather the evidence of the alleged interference with Young. Although the substance of their testimonies would not be newly discovered evidence since it was known to Scroggins before trial (both witnesses met with Scroggins's counsel before the time of their scheduled testimony, *see Ouimette*, 798 F.2d at 51), again there is no indication that Scroggins was *primarily* concerned about the alleged government interference evidence as opposed to the substantive evidence. Thus, the court's treatment of the motion as one based on (or only on) newly discovered evidence was not warranted.

[43] Even if Scroggins's motion were based only on newly discovered evidence, because it was timely made within the Rule 33(b)(2) time limit, the district court likely still should have considered the interest of justice in its analysis. *See United States v. Ugalde*, 861 F.2d 802, 808 (5th Cir. 1988) (commenting that when a motion for new trial under Rule 33 is made within seven days of the verdict, "courts will grant the motion, even if based on newly discovered evidence, whenever it is in the interest of justice to do so") (internal quotations and citations omitted).

[44] We do not suggest, however, that the district court would have *necessarily* exercised its discretion to grant a new trial if it had considered the motion in the interest of justice, nor do we suggest that the interest of justice *required* a new trial. Those are matters to be addressed in the first instance by the district court.

*Rachal*, 473 F.2d 1338, 1343 (5th Cir. 1973) (recognizing "the heavier burden which the movant must carry" in a new trial motion based on newly discovered evidence in contrast to motions "based on other grounds, which must be made within seven days after verdict"); 3 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 551 (3d ed. 2004) ("[M]otions for new trial on the ground of newly discovered evidence are not favored, and are to be granted with caution. It is a mistake to extend this proposition to motions for a new trial because of trial errors or other grounds. Here the motion should be neither favored nor disfavored, and the question is only what the interest of justice requires.") (footnote omitted). Moreover, the standard chosen by the district court to analyze a new trial motion will likely have an effect on the exercise of its discretion: "Just as our standard of review shapes our decision in this appeal, the standards that guide a trial court's Rule 33 analysis shape its review of the trial evidence and the outcome of defendant's Rule 33 motion." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001).

### b. *Interest of Justice and Presence of Legal Error*

A district court may grant a new trial where it "finds that a miscarriage of justice may have occurred at trial." *Robertson*, 110 F.3d at 1120 n.11; *see also Ferguson*, 246 F.3d at 133 ("[Rule 33] by its terms gives the trial court broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived

36

miscarriage of justice.") (internal quotation and citation omitted). A miscarriage of justice warranting a new trial in certain circumstances may occur even when there has been no specific legal error. *See United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994); FEDERAL PRACTICE AND PROCEDURE, *supra*, § 551.[45]

*United States v. Patterson*, 41 F.3d 577 (10th Cir. 1994), presents a somewhat analogous situation. There the district court granted a Rule 33 motion for new trial made in the interest of justice.[46] *Id.* at 579. The defendant's brother was to testify for the defendant, and during jury selection and opening statement the jury was made aware by defense counsel that the brother was present in the courthouse, would testify for the defense, and had first

---

[45] On this issue, the parties dispute the applicability of *United States v. Smith*, 67 S.Ct. 1330 (1947). In *Smith*, the district court stated in granting a motion for new trial: "'This Court . . . reconsidered the grounds urged by the defendant in support of his motion for a new trial. It is our opinion upon this reconsideration that in the interest of justice a new trial should be granted the defendant.'" *Id.* at 1331. The district court "assigned no more particular ground for the order." *Id.* When the government filed a petition with the court of appeals for writs directing that the order be vacated, the district judge responded by referring to the memorandum in which it granted the motion "but did not further elucidate his reasons for granting a new trial." *Id.* The court of appeals denied the writs. The Supreme Court noted that "[t]he generality of the reasons assigned by [the district court] for the order in question is all that is required." *Id.* at 1332. However, the Court reversed the court of appeals and issued writs vacating the order for new trial, holding that a district court could not grant a motion for new trial after its initial denial of the motion had been affirmed on appeal. *Id.* at 1333–34. The Supreme Court in *Smith* also stated that "[n]ew trials . . . may be granted *for error* occurring at the trial or for *reasons* which were not part of the court's knowledge at the time of judgment." *Smith*, 67 S.Ct. at 1333 (emphasis added). We conclude that *Smith* provides no clear guidance on the present issue.

[46] The Tenth Circuit's opinion does not specify when the motion for new trial was filed; however, the court specifically found "'that in the interest of justice the defendant should be granted a new trial.'" *Patterson*, 41 F.3d at 579. Thus, presumably the motion was filed within seven days of the verdict.

hand knowledge of important facts.  However, when it came time for the brother to testify, he could not be found, even though he had been present at court earlier that morning.  The district court allowed a short recess to locate the witness, but he still could not be found.  The defendant requested a continuance, which the district court denied.  *Id.* at 578.  Following the jury's guilty verdict, the defendant moved for a new trial, submitting an affidavit from his brother, the missing witness, stating that he had left the courthouse at lunchtime to run a personal errand, and that while away, his truck broke down, and he was unable to contact anyone until later that afternoon, after the verdict.  *Id.*

In granting a new trial, the district court found that "the absence of [the witness] could have been prejudicial to defendant because the jury had been told, and was anticipating the testimony of [the witness], and the fact that he did not testify could have created an inference that his testimony would not have been favorable to the defense."  *Id.* at 579.  The district court "accepted [the witness's] excuse, giving him the benefit of the doubt, with a finding that [the witness] may not have been able to find a telephone to call in the news of his breakdown until it was too late."  *Id.*

The Tenth Circuit affirmed the district court, rejecting the government's argument that "the trial court could not sustain the motion for new trial since the court did not make any finding that

the initial denial of a continuance was an 'abuse of discretion.'" *Id.* The Tenth Circuit stated that "a trial judge is not obliged to review his past trial rulings and make an independent judgment that he himself has 'abused his discretion' before granting a new trial." *Id.* The Tenth Circuit concluded that the district court had not abused its discretion in granting the new trial, *id.*, even though neither the district court nor the Tenth Circuit pointed to any specific legal error.

We therefore remand this case to the district court to consider Scroggins's motion for new trial in the interest of justice and conclude that the district court may grant a new trial in the interest of justice even if it does not find that a specific legal error occurred at trial. Nevertheless, the district court's discretion to grant a new trial, although broad, is not without bounds. *Robertson*, 110 F.3d at 1118. *See* FEDERAL PRACTICE AND PROCEDURE, *supra*, § 551 ("The court has discretion in passing on the [new trial] motion, but it should hold in mind the harmless and plain error provisions of Rule 52, and *refuse to grant a new trial if the substantial rights of the defendant were not affected*.") (emphasis added) (footnotes omitted). In appropriate instances, we have not hesitated to set aside a trial court's grant of a new trial in criminal cases. *See, e.g., United States v. Logan*, 861 F.2d 859 (5th Cir. 1988); *United States v. Leal*, 781 F.2d 1108, 1111 (5th Cir. 1986). Absent legal error, for the district court

39

to grant a new trial, it must, in the exercise of its discretion, find *either* that the absence of Young or Thomas (or both together) resulted in a *manifest injustice* and that Scroggins would have *probably been acquitted* if the jury had heard their testimonies, *United States v. Sanchez*, 969 F.2d 1409, 1414-16 (2d Cir. 1992), *or* that, with the additional testimony, the evidence would "*preponderate heavily against the verdict*, such that it would be a *miscarriage of justice* to let the verdict stand." *Robertson*, 110 F.3d at 1118 (emphasis added) (internal citations omitted). In its analysis, however, the district court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.*

We also emphasize that because we have upheld the district court's finding that the government did not interfere with Young and Thomas, the case for a new trial must be stronger than if the district court had found governmental interference. The absence of governmental misconduct means that the district court should grant the new trial only if it concludes, in the exercise of its discretion, *see United States v. Arroyo*, 805 F.2d 589, 599 (5th Cir. 1986), *either* that the jury *probably* would have acquitted Scroggins with the testimonies of Young or Thomas, rather than simply that the jury *might* have acquitted, *cf. Sanchez*, 969 F.2d at

1414-16,[47] *or* that had Young and Thomas testified the evidence would so heavily preponderate against the verdict that it would be a miscarriage of justice to let it stand.

### c. District Court's Materiality Determination

Because the district court should consider Scroggins's motion for new trial in the interest of justice in the first instance, at this stage it is not appropriate for us to review the district court's finding that Young and Thomas would have given material testimony if they had testified at trial.[48] However, we note that in any event the record before is not sufficiently developed to rule on the district court's materiality determination. The district court declared in its ruling on the new trial motion that it had "already determined in open court that the testimony Young and Thomas were to provide is material"; however, it did not make any other reference to its materiality determination or to findings upon which it based its conclusion that their testimony was material. In the new trial hearing the district court did state

---

[47] In the context of false testimony, the Second Circuit explained in *Sanchez* that "[e]ven in a case where perjury clearly has been identified, however, we have indicated our reluctance to approve the granting of a new trial unless we can say that the *jury probably would have acquitted* in the absence of the false testimony. It is only in the rare instance where it can be shown that the *prosecution knowingly used false testimony* that we would apply a less stringent test and permit the granting of new trial where the *jury 'might' have acquitted* absent the perjury." *Sanchez*, 969 F.2d at 1413-14 (emphasis added) (internal citations omitted).

[48] The government has argued that the district court was incorrect in concluding that Young and Thomas were material witnesses.

that the witnesses were very important and could have made a difference; however, the court never did make any specific findings upon which it based its materiality determination. Furthermore, during Thomas's testimony the district court clearly and repeatedly prevented Scroggins's counsel from going further into the substance of what Thomas would have testified to at trial.[49] In addition, at the conclusion of the new trial hearing, the district court again expressed its view that Young and Thomas were important witnesses, but expressly instructed the parties to limit their arguments in their post-hearing briefs to the governmental interference issue, clearly implying that they were not to address the materiality issue.

Because the issue of materiality is a mixed question of law

---

[49] Thomas testified at the new trial hearing that: 1) he told the agents that Scroggins did not sell drugs, but that the agents wanted him to attempt to purchase drugs from Scroggins anyway; and 2) when he asked Scroggins for drugs, Scroggins said, "You know I don't do that."

After hearing this much of Thomas's substantive testimony, the district court indicated that Thomas "could have been a very important witness" and repeatedly directed Scroggins's counsel to limit the questioning to the issue of governmental interference:

> "THE COURT: Let me see if I can be absolutely clear to you. I am satisfied that [Thomas], testifying as he has testified today, could have made a difference. *You need not go any further into that.* The question for you is: Did the government have something, do something wrong to prevent his testifying? *That is all I am any longer interested in.* Proceed." (emphasis added).

Scroggins's counsel had more questions to ask concerning Thomas's substantive testimony, but finally conceded, after the district court had repeatedly rejected her several attempts to further pursue what testimony Thomas would have given at trial, that the district court would not let her go any further on that issue:

> " [Scroggins's Counsel]: Your Honor, I have no further questions with [Thomas]. I had a lot of other questions regarding the testimony he would have given at trial, but I can see that Your Honor is not letting me go into that field.
> THE COURT: I'm not going any further into that field."

42

and fact, our review is generally *de novo*, meaning "we undertake an independent appellate analysis to determine whether the facts found by the trial court rise to the level of the applicable legal standard." *United States v. O'Keefe*, 128 F.3d 885, 893–94 (5th Cir. 1997). In this case the district court did not make any specific factual findings regarding the testimonies of Young and Thomas. Its only determinations were that the testimonies were important and could have made a difference and that it was interested in them. In any event, with respect to Thomas, the district court did not allow Scroggins to fully develop the record concerning the substance of his testimony. Therefore, even if it were appropriate for us to rule on the district court's materiality determination, we could not do so on the record before us.

With the foregoing in mind, in considering Scroggins's new trial motion in the interest of justice on remand, the district court may need to hold a further hearing (if timely and properly requested to do so by either party).

**B.    Failure to Issue Bench Warrant and Right to Compulsory Process**

Scroggins argues that he is entitled to a new trial because he was denied compulsory process when the district court did not issue bench warrants compelling Young and Thomas to appear. We disagree.

**1.    Standard of Review**

Scroggins did not raise the issue of the district court's failure to issue a bench warrant before the district court, either

43

at trial or in his motion for new trial. Therefore, as he is raising this argument for the first time on appeal, we review it for plain error. *United States v. Serna-Villarreal*, 352 F.3d 225, 231 (5th Cir. 2003).

## 2. Sixth Amendment Right to Compulsory Process

Under the Sixth Amendment, "'criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" *United States v. Soape*, 169 F.3d 257, 268 (5th Cir. 1999) (quoting *Pennsylvania v. Ritchie*, 107 S.Ct. 989, 1000 (1987)). "The compulsory process right is not absolute, however; when *requesting* a court to subpoena a witness, a defendant has the *duty to demonstrate the necessity* of the witness's testimony." *Soape*, 169 F.3d at 268 (emphasis added). To show a violation of the constitutional right, the defendant must show more than that he was deprived of certain testimony; he must instead "make some plausible showing of how [that] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 102 S.Ct. 3440, 3446 (1982).

Therefore, to show a violation of his right to compulsory process regarding Young or Thomas, Scroggins must have 1) requested the court to issue a bench warrant compelling the witnesses to appear and 2) demonstrated the necessity of the witnesses'

44

testimony by making a plausible showing of how their testimony would have been both material and favorable to his defense. *Soape*, 169 F.3d at 268.

### 3. District Court's "Refusal" to Issue Bench Warrants

#### a. Freddie Young

Scroggins did not meet his duty of demonstrating the necessity of Young's testimony. When Young did not appear in court, Scroggins's counsel did not even mention Young by name and did not say anything about him to show how his testimony would have been material and favorable.

#### b. James Thomas

When Thomas did not appear, Scroggins's counsel *briefly* explained the importance of his testimony:

> "[Thomas] was referred to in the testimony of Special Agent Clifton (sic) Simmons, the undercover agent who conducted the buy [with Earl Buchanan] on November 15, 2000. James Thomas was the confidential informant of the government who was the go-between between Earl Buchanan, and *his testimony is completely and totally exculpatory* as to what Agent Simmons testified to, and I think he is crucial to my case." (emphasis added).

That Thomas's testimony would be "completely and totally exculpatory as to what Agent Simmons testified to" is, however, simply conclusory and does not allege any specific facts that would lead the trial court to conclude that Thomas's testimony was both material and favorable to Scroggins's defense. *See Janecka v. Cockrell,* 301 F.3d 316, 326–27 (5th Cir. 2002) ("Janecka's explanation of how Duff-Smith's testimony might have been material

45

and favorable to his defense is *vague at best*.  He fails to offer *any details* regarding what *specific information* Duff-Smith could have provided or why Duff-Smith's testimony would not have been merely cumulative of other evidence presented at trial.")[50] (emphasis added); *United States v. Gonzales*, 79 F.3d 413, 424 (5th Cir. 1996) ("The government may respond [to a defendant's request to subpoena a witness] by demonstrating that *the facts* upon which the defense relies are inaccurate . . . .") (emphasis added). Further, the statement that Thomas's testimony is "exculpatory as to what Agent Simmons testified to" did not help Scroggins at

---

[50] In *Janecka*, the potential witness, Duff-Smith, submitted a signed affidavit stating that "if given the opportunity [to testify], [he] could provide information and testimonial evidence relating to defensive strategies for Mr. Janecka's trial, including but not limited to, exculpatory evidence, impeachment evidence of State witnesses, rebuttal evidence, as well as mitigation evidence, if applicable." *Janecka*, 301 F.3d at 325–26 n.14.  Janecka also submitted that:

> "1. Duff-Smith's testimony would dispute that Janecka was in the chain of remuneration for this crime;
> 2. Duff-Smith's testimony would establish that he did not pay Walt Waldhauser to pay Janecka to murder;
> 3. Duff-Smith would testify that various state witnesses were lying;
> 4. Duff-Smith would testify that if Janecka did murder for hire, he did it out of duress from the mafia; and
> 5. Duff-Smith would testify in mitigation of sentence." *Id.* at 326.

In spite of these descriptions of Duff-Smith's potential testimony, the court held that Janecka had failed to show how the offer of proof could have helped his defense:

> "The only specific point Janecka suggests Duff-Smith would have made had he been able to testify at trial was that he did not pay Waldhauser to hire Janecka to murder the Wanstraths. . . .  Because the State's theory was that Waldhauser, rather than Duff-Smith, paid Janecka to kill the Wanstraths, any evidence that Duff-Smith did not intend for Waldhauser to hire Janecka would have been of little value." *Id.* at 327.

Scroggins's description of Thomas's potential testimony is less helpful than Janecka's in making a plausible showing of how Thomas's testimony would have been material and favorable to his defense.

46

all—even if specific facts had been given.  Simmons testified merely to identify the cocaine purchased by the government in the controlled buy with Buchanan on November 15, 2000.  None of his testimony implicated Scroggins and it is not clear how Thomas's testimony would have been "exculpatory as to what Agent Simmons testified to."  It was Buchanan that later testified that the drugs that he sold that day were supplied by Scroggins.  Because Scroggins failed to make the required plausible showing of the need for Thomas's testimony, Scroggins's right to compulsory process was not violated by a failure to issue the bench warrant.[51]

Moreover, Scroggins did not *explicitly request* that the district court issue bench warrants to compel the presence of the witnesses.  When Thomas did not appear at trial on Wednesday morning, the following exchange took place between the district court and Scroggins's counsel:

> "[Scroggins's Counsel]: I have three [witnesses] that are not here and I—I have subpoenaed.  *I may want writs issued* and—
> THE COURT: Have you talked to them?
> [Scroggins's Counsel]: I talked to two of them last night, and the other one, even though I've subpoenaed him, paid his witness fees, done everything properly, he

---

[51] Scroggins relies on *United States v. Simpson*, 992 F.2d 1224 (D.C. Cir. 1993). In *Simpson* the defendant specifically asserted facts that directly contradicted testimony of a police officer.  The defendant asserted that the witness "was allegedly standing about twenty-five feet from [the police officer] and Simpson during the encounter, witnessed the frisk and did not see a bag, or any other object, fall out of Simpson's pocket." *Id.* at 1230.  "This testimony, if believed by the jury, could have substantially undercut the Government's case." *Id.*  In contrast, the description of Thomas's testimony by Scroggins's counsel was merely conclusory and did not present specific facts to undercut the government's case.

is not responding and I have a feeling that—

\* \* \*

THE COURT: When did the subpoena say he should appear?

[Scroggins's Counsel]: The subpoena had told him to appear on Monday, and we called all of our witnesses and left messages to come Wednesday.

THE COURT: Then I hope he is here. These last-minute actions on your—just *if he's not here, we're going on.*

[Scroggins's Counsel]: Then I'll—

THE COURT: *A bench warrant will take anywhere from a day to a week to execute.*

[Scroggins's Counsel]: Then I'd like to make a comment on the record as of what I think happened.

\* \* \*

THE COURT: I suggest you send [the defense investigator] out to find him, because you're going to need him and *I'm not going to delay this trial any further.*" (emphasis added).

Scroggins contends that his trial counsel was about to request a bench warrant and did not only because of the district court's implicit rejection of the anticipated request and that he was not required to "continue fighting" with the district court once it had indicated that it would not issue a bench warrant.

We recognize that at times a party in Scroggins's position may be excused from explicitly making a request for a bench warrant for a material witness. An arguably analogous situation is when a party is excused from raising objections to proposed jury instructions:

"A party may be excused from the requirement of making a specific objection only where the party's position previously has been made clear to the trial judge and it is plain that a further objection would be unavailing. Only when the appellate court is sure that the trial court was adequately informed as to a litigant's contentions may the appellate court reverse on the basis of jury instructions to which there was no formal objection." *Russell v. Plano Bank & Trust*, 130 F.3d 715,

720 (5th Cir. 1997) (internal quotations and citations omitted).[52]

Projecting this excuse for failure to object to jury instructions to the present situation, in order for Scroggins to be excused for not requesting a bench warrant, Scroggins would have to show that 1) he previously made clear to the district court his position that Thomas was a materially favorable witness and that he needed a bench warrant to compel Thomas's attendance and 2) it is plain that a further request for a bench warrant would be unavailing.

Based on the trial judge's statements that "[a] bench warrant will take anywhere from a day to a week to execute," "if he's not here, we're going on," and "I'm not going to delay this trial any further," particularly in light of Scroggins's counsel's statement that "I may want writs issued" for the missing witnesses, it is plain that it would have been unavailing for Scroggins to request a bench warrant for Thomas. Nevertheless, as discussed above, Scroggins did not successfully make clear his position, other than in mere conclusory terms, that Thomas was a materially favorable witness. Therefore, Scroggins's failure to explicitly request a bench warrant is not excused, further supporting the conclusion that the failure to issue a bench warrant for Thomas was not plain error.

### C. Ineffective Assistance of Counsel

---

[52] Although *Russell* involves a rule of civil procedure, FED. R. CIV. P. 51, the parallel rule under the rules of criminal procedure, FED. R. CRIM. P. 30, has the same objection, and excuse for failure to object, requirements. *United States v. Redd*, 355 F.3d 866, 874 (5th Cir. 2003).

On the final issue concerning Scroggins's missing witnesses, Scroggins contends that he should be granted a new trial because his trial counsel's failure to request a continuance upon the nonappearance of Young and Thomas was ineffective assistance of counsel. Because Scroggins did not properly raise it before the district court, we decline to address the merits of Scroggins's ineffective assistance of counsel claim.

During the new trial hearing, Scroggins's counsel asserted that she had requested a continuance when Young and Thomas did not appear at trial; however, the district court could not recall the request or find it in the trial transcript. In the brief in support of the motion for new trial, requested by the district court at the end of the January 2003 hearing, Scroggins's counsel continued to assert that she had made such a request,[53] even though no evidence of the request for a continuance could be found in the record.[54] Scroggins's counsel then argued in the brief that if the district court believed that she did not request a continuance, the failure

---

[53] With his brief in support of his motion, Scroggins filed an unsworn statement from Bryant's counsel stating that she remembered that Scroggins's counsel had requested a continuance. Scroggins also pointed to the government's memorandum in support of its response to Scroggins's motion—filed before Scroggins raised the ineffective assistance of counsel claim in his brief and before preparation of the trial transcript—where the government states that Scroggins had requested a continuance when Scroggins's witnesses did not show up and that the district court had denied the request.

[54] We have found no indication of a request for a continuance made by Scroggins at trial; on appeal, Scroggins has conceded that no such request is found in the record or on the backup tapes of the trial. Scroggins has not sought to correct or supplement the record under FED. R. APP. P. 10(e) or otherwise.

to do so was ineffective assistance of counsel—because Young and Thomas were the "most crucial part" of the defense trial strategy. In denying Scroggins's motion for new trial, the district court did not mention the ineffective assistance issue.

In general, we do not resolve claims of ineffective assistance of counsel on direct appeal when the claim has not been raised before the district court since there was no opportunity to develop the record on the merits of the claim. *United States v. Higdon*, 832 F.2d 312, 313–14 (5th Cir. 1987).

Scroggins did not properly raise the ineffective assistance of counsel issue before the district court. Even though "issues raised for the first time in post judgment motions are preserved for appeal," *Instone Travel Tech Marine & Offshore v. Int'l Shipping*, 334 F.3d 423, 431 n.7 (5th Cir. 2003), Scroggins's attempt to raise the claim did not properly bring it before the district court. Scroggins did not raise the claim in his new trial *motion* or in the hearing on the motion, but only *after* the hearing and without amending his previously filed motion. Further, because the claim was raised in conjunction with a request for a new trial made more than seven days after the verdict, Scroggins was at that time limited to moving for a new trial only on the basis of newly discovered evidence, Rule 33(b)(2), and we have held that "a Rule 33 motion, filed more than seven days after the verdict and premised on 'newly discovered evidence,' is an improper vehicle for raising

51

a claim of ineffective assistance of counsel." *United States v. Medina*, 118 F.3d 371, 372 (5th Cir. 1997) (citing *Ugalde*, 861 F.2d at 807–09). Therefore, we decline to address the merits of Scroggins's ineffective assistance of counsel claim; however, we do so without prejudice to Scroggins's right to raise the issue pursuant to 28 U.S.C. § 2255. *See Higdon*, 832 F.2d at 314.

## II. *Prosecution's Misstatement of the Law in Closing Arguments*

Scroggins contends that a new trial is justified because the government misrepresented an element of the conspiracy charge during its closing arguments. During trial there was evidence that Scroggins was a drug addict. During its rebuttal at closing argument, the government referred to this:

> "And if Mr. Donald Scroggins is a drug addict, where, ladies and gentlemen, where was he getting the drugs? For him to get cocaine necessarily means that he's involved in cocaine trafficking. There's two people in that conspiracy right there: the person he got the drugs from and himself."

Scroggins, however, did not object to the government's argument.

Scroggins argues that this comment misstates the elements of a conspiracy by implying that a mere buyer-seller relationship was sufficient to establish a conspiracy. As Scroggins has not shown that he was prejudiced by this comment, we decline to reverse his conviction on this basis.

Objections to comments made during closing arguments that are raised for the first time on appeal are reviewed for plain error. *United States v. Flores-Chapa*, 48 F.3d 156, 159 (5th Cir. 1995).

52

Plain error is reviewed using a three-part test: "First, there must be error, next, that error must be plain, and finally, the error must affect substantial rights." *Id.* If we find such plain error, we have the discretion to correct the error, but are not required to do so. *United States v. Vital*, 68 F.3d 114, 119 (5th Cir. 1995). "Plain errors affecting substantial rights should be corrected on appeal *only* if they seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotations and citations omitted).

"Proof of a buyer-seller agreement, without more, is not sufficient to tie a buyer to a conspiracy." *United States v. McKinney*, 53 F.3d 664, 672 (5th Cir. 1995). For the government to argue that because Scroggins uses drugs, for "him to get cocaine *necessarily* means that he's involved in cocaine trafficking" implies that merely because Scroggins buys drugs from a seller, he is involved in a conspiracy. Such an implication is legally erroneous.

This error, however, did not affect Scroggins's substantial rights and did not "seriously affect the fairness, integrity, or public reputation" of the proceeding. *Vital*, 68 F.3d at 119. We therefore decline to reverse on this basis.

There is a significant amount of testimony, besides Scroggins's characteristic as a drug addict-buyer, to support a jury finding that Scroggins was involved in a conspiracy. Further, the district court properly instructed the jury on the elements of a drug

53

conspiracy and told the jury to base their verdict on the evidence presented through witness testimony and not on the argument of counsel. *See United States v. Ellender*, 947 F.2d 748, 758 (5th Cir. 1991). Finally, the complained of statement was but a very small portion of the prosecutor's arguments and there was no other like statement or implied assertion that the mere buyer-seller relationship equated to a conspiracy. Scroggins has not demonstrated prejudice because of the prosecutor's statement.

### III. District Court's Refusal to Grant Access to the Presentence Reports for Key Witnesses

Scroggins claims that the district court erred when it denied his pretrial request that the government produce the presentence reports (PSRs) for two key government witnesses, Earl Buchanan and Gregory Byrd, that had been produced in connection with their drug prosecutions. The district court denied the motion without giving any reasons and without any indication that it had reviewed the reports in camera.

*United States v. Carreon*, 11 F.3d 1225 (5th Cir. 1994), presents a similar situation and describes the proper result. In *Carreon*, the defendant had "requested access to the PSRs of [the coconspirator] witnesses in order to acquire any exculpatory or impeachment information under *Brady* and *Giglio*." *Id.* at 1238. We held that the district court erred in denying the request and remanded the case so that the district court could inspect the PSRs and "determine whether [the defendant] was in fact denied access to

54

material *Brady* or *Giglio* information and, if so, whether he suffered prejudice as a result of this denial." *Id.*

Similar to *Carreon*, Scroggins requested access to the PSRs of key government witnesses. The district court denied the request, without indicating whether it had conducted an in camera review of the PSRs and without making the PSRs part of the record. We therefore remand the case in order for the district court to

> "1) conduct an in camera inspection and make appropriate findings as to whether the PSRs of the government witnesses contained any material *Brady* or *Giglio* information, and 2) compare those findings against the evidence [Scroggins] had at trial to determine whether the failure to provide this information was harmless error. So that these findings and conclusions are reviewable on appeal, we require that the district court ensure that these PSRs are made a part of the record, albeit under seal if need be." *Id.*

## IV. *Information Relied on by the District Court at Sentencing*

Scroggins argues that information upon which the district court relied in setting his sentence did not bear a sufficient indicia of reliability. Scroggins specifically objects to information and testimony provided by Buchanan concerning the amount of crack cocaine involved in the conspiracy of which Scroggins was convicted and Scroggins's alleged obstruction of justice. In both instances, Buchanan was the only source upon which the guideline calculation was based. Scroggins claims that because the information relied upon by the district court at sentencing is inconsistent with Buchanan's testimony at trial, and is also hearsay, the information

could not properly be used to set Scroggins's sentence.[55]

## A.  *Standard of Review*

Factual findings under the Sentencing Guidelines are reviewed for clear error.  *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004).  Findings as to the amount of drugs attributable to a defendant and that a defendant has obstructed justice are both factual findings reviewed for clear error.  *United States v. Posada-Rios*, 158 F.3d 832, 878 (5th Cir. 1998) (quantity of drugs); *United States v. Rickett*, 89 F.3d 224, 226 (5th Cir. 1996) (obstruction of justice).  "The district court's findings are not clearly erroneous if they are plausible in light of the record reviewed in its entirety."  *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002) (internal quotation and citation omitted).

## B.  *District Court's Findings*

The district court found that "there's no doubt in [its] mind from the testimony at trial and the testimony hear today that Mr. Scroggins was involved in a conspiracy that dealt in more than 1.5 kilograms of crack cocaine."[56]  The district court also found that

---

[55] Scroggins asserts that much, if not all, of Buchanan's testimony was rejected by the jury by its acquittal of Scroggins on count 2 and Bryant on count 1, and therefore, that Buchanan's testimony cannot be relied upon at sentencing.  As "the jury cannot be said to have necessarily rejected any facts when it returns a general verdict of not guilty," *United States v. Watts*, 117 S.Ct. 633, 637 (1997), the acquittals are essentially immaterial as to whether Buchanan's testimony could have been relied on for sentencing purposes.

[56] Even though the PSR indicated that Scroggins had trafficked in more than 1.5 kilograms of crack cocaine, because the Sentencing Guidelines mandate the statutory-maximum life sentence

Buchanan had testified that "Mr. Scroggins tried to get him to take the charges" and applied the obstruction of justice enhancement. We review whether these findings are plausible in light of the record in its entirety.

### C.     *Obstruction of Justice*

Buchanan was the only source indicating that Scroggins merited the obstruction of justice enhancement under U.S.S.G. § 3C1.1. At trial on redirect examination, Buchanan testified that Scroggins and Bryant had asked him not to testify at their trial and promised him financial support for not testifying.

Scroggins raises this issue because the district court's finding, and the PSR upon which the district court presumably based its finding, differed from Buchanan's actual testimony. The PSR stated that Buchanan "testified in court [that Scroggins] tried to get him to 'take the charges' so [Scroggins] could get away with being prosecuted for any criminal behavior and [Scroggins] would take care of [Buchanan] if he were to do this for him." In making its finding, the district court repeated the substance of the PSR: "Buchanan has testified that Mr. Scroggins tried to get him to take

---

for 1.5 kilograms or more of crack cocaine, U.S.S.G. § 2D1.1(c)(1), any amount of crack over 1.5 kilograms is irrelevant. The district court pointed this out at the beginning of the sentencing hearing. Because the amount of cocaine powder involved in the conspiracy is not close to the amount needed to uphold Scroggins's life sentence—150 kilograms or more, *id.*—the amount of powder cocaine is also irrelevant for purposes of analyzing the validity of Scroggins's life sentence.

the charges." Our review of Buchanan's testimony at trial—upon which the PSR and the district court supposedly relied—does not disclose any specific "take the charges" testimony.

Nevertheless, the district court's ultimate finding that Scroggins merited the obstruction of justice enhancement, in respect to his efforts to use Buchanan to obstruct justice with reference to his trial, is sufficiently supported by the record. Buchanan testified that Scroggins: asked him not to testify in Scroggins's trial, promised him financial support if he did not testify, and asked him not to say anything about Scroggins at the trial. As the district court's finding of obstruction of justice is plausible in light of the record reviewed in its entirety, the finding is not clearly erroneous. *Solis*, 299 F.3d at 455.

### D. *Amount of Crack Cocaine*

#### 1. *Buchanan's Information*

Buchanan was the only source—either at trial or at sentencing—for the amount of *crack* cocaine involved in the conspiracy. At sentencing, Agent Green testified that Buchanan had told him in an interview that Scroggins had trafficked in at least ten kilograms of cocaine, seven of which were cocaine powder and three of which were crack cocaine.[57]

At trial, however, Buchanan did not testify to the amounts he

---

[57] Although Green's testimony at sentencing did not give the time frame of Buchanan's estimate, Scroggins's PSR did limit Buchanan's information to the period of the conspiracy.

had communicated to Green. Buchanan first testified that Scroggins was purchasing cocaine from Shirley Preston from the end of 1998 to the end of 1999 or the first part of 2000. These purchases consisted of one or two kilograms of cocaine at a time, occurred approximately once a month, but sometimes less frequently, and consisted of powder cocaine only. When Buchanan sold this cocaine for Scroggins, some of it was in the crack form. Regarding the cocaine purchased from Preston, Buchanan's testimony of the amount of crack cocaine was as follows:

> "[Gov't]: Do you know approximately how much crack you sold?
> [Buchanan]: No, sir. More powder than crack.
> [Gov't]: Was it more than 50 grams of crack?
> [Buchanan]: Yes, sir."

Buchanan then testified that Scroggins purchased cocaine from David Sosa starting in the first part of 2000. These purchases consisted of one to two kilograms at a time and occurred approximately once a month. Buchanan testified that this cocaine consisted in all of about five kilograms—one kilogram of crack and four of powder.

### 2. Amount of Drugs and Inconsistent Information

In making factual findings under the Sentencing Guidelines, "the district court may consider *any information* which bears *sufficient indicia of reliability* to support its probable accuracy, *including hearsay evidence*, without regard to admissibility under the Federal Rules of Evidence which govern at trial." *Solis*, 299 F.3d at 455 (emphasis added) (internal quotation and citation

59

omitted).   Even when a witness has "told lies and contradicted himself," although it "creates a credibility question for the district court to resolve," the testimony *may still* bear a sufficient indicia of reliability.  *United States v. Ramirez*, 963 F.2d 693, 708 (5th Cir. 1992).

Specifically with respect to calculating the amount of drugs, the Seventh and Third Circuits have addressed the question of how a district court should deal with inconsistencies and contradictions among the different testimonies of the same witness or between a sworn testimony of a witness and a hearsay statement of that witness.   In *United States v. Beler*, 20 F.3d 1428 (7th Cir. 1994), the district court relied on two affidavits from a government witness and the trial testimony of a second witness in calculating the drug amount.  *Id.* at 1430.   The information and testimony from the witness who supplied the affidavits was: 1) at trial, the witness was unable to estimate the quantity of cocaine he had purchased from the defendant; 2) the first affidavit, signed prior to the defendant's sentencing, stated that the witness had purchased 150 to 200 ounces of cocaine from the defendant; and 3) the second affidavit stated that the amount in the first affidavit was incorrect because of a typographical error and that the correct amount should have been 15 to 20 ounces of cocaine.  *Id.*   The Seventh Circuit found that the district judge's conclusory finding as to the reliability of the second affidavit was not acceptable and

held that the district court should have further explored the factual basis for the estimate before accepting the amount as uncontroverted. *Id.* at 1433–34. The Seventh Circuit also recognized that "the district court should have subjected any information provided by [this witness] to special scrutiny in light of his dual status as a cocaine addict and government informant." *Id.* at 1435. The district court in *Beler*, because of these inconsistencies among the witness's affidavits and his trial testimony, clearly erred when it did not subject the affidavits to "searching scrutiny." *Id.* at 1435. Nevertheless, the Seventh Circuit noted that on remand, this witness was not barred from providing drug quantity information, provided that "the district court scrutinize that information to ensure that it possesses sufficient indicia of reliability to support its probable accuracy." *Id.* (internal quotation and citation omitted). In *United States v. McEntire*, 153 F.3d 424, 437 (7th Cir. 1998), the court was faced with a situation analogous to that in *Beler* and reached the same result, remanding for the district court to directly address the contradiction and explain why it credited one statement rather than the other.

In *United States v. Brothers*, 75 F.3d 845 (3d Cir. 1996), a coconspirator testified at the sentencing hearing that the defendant "never knew the amount of cocaine involved"; however, the FBI agent who had initially interviewed the coconspirator gave hearsay

testimony at sentencing that the coconspirator had stated earlier that the defendant *did* know of the amount of drugs involved in the transaction. *Id.* at 847. The Third Circuit went on to emphasize that, in general, hearsay evidence can be proper sentencing evidence—and it may even be credited "over sworn testimony, especially where there is other evidence to corroborate the inconsistent hearsay statement." *Id.* at 848 (internal quotation and citation omitted). Although the district court gave reasons why it believed that the hearsay evidence from the FBI agent was more credible than the testimony of the coconspirator, *id.* at 850, the Third Circuit concluded that the reasons could not support the district court's conclusion. *Id.* at 853.

These cases illustrate the following principles in the context of calculating the amount of drugs for sentencing purposes: 1) a witness's inconsistent and contradictory testimonies, be they from sworn testimony or hearsay, may properly form the basis for calculating the amount of drugs; 2) however, in cases of inconsistent or contradictory statements from the same witness, the district court must sufficiently scrutinize the evidence, and 3) provide a rationale in the record for why it chose to believe one inconsistent statement over another.

### 3. District Court's Reliance on Buchanan's Information

#### a. Hearsay Evidence

We reject Scroggins's contention that the district court could

62

not have relied on Green's testimony of what Buchanan told him because it was hearsay.  As a district court may properly rely on hearsay evidence at sentencing, *Solis*, 299 F.3d at 455, the hearsay nature of Green's testimony, by itself, does not create any error.

### b.    *Amount of Drugs*

In sum, Buchanan's versions of the amount of crack cocaine for which Scroggins was responsible included: 1) trial testimony of *at least 1.05 kilograms*, but with Buchanan *unable to know the approximate total amount* (more than fifty grams from Preston, and one kilogram from Sosa); and 2) information given to Green of *about three kilograms*.  While the amounts differ, the two accounts would not necessarily be inconsistent but for Buchanan's testimony that *he did not know approximately how much* of the Preston-cocaine was crack cocaine.

We conclude that the district court did not sufficiently scrutinize Buchanan's inconsistent statements and did not provide a rationale in the record for believing one version over another. In detailing its findings, the district court stated that it had relied on the testimony at trial and at sentencing, but it did not say anything about the differences between Buchanan's trial testimony and the information Buchanan gave Green and of which Green testified at sentencing.

It also appears that in arriving at its finding, the district court was confused, and likely influenced, by other evidence given

at the sentencing hearing and in the PSR concerning the amount of cocaine. Green also testified at sentencing that Scroggins had told Green that he had received one to two kilograms of cocaine approximately every two weeks for about a three- to four-month period.[58] On cross-examination, Green added that this purchase-pattern could have resulted in at least 6 kilograms of cocaine, but that it could have been more. Green, however, did not distinguish at all between powder or crack cocaine. Nevertheless, as Scroggins's counsel was giving her closing statements at sentencing, it was apparent that there was confusion about whether Green had testified about powder or crack cocaine:

> "[Scroggins's Counsel]: . . . And unless the Court is believing solely and only the testimony of Earl Buchanan, . . . then the Court could find reason for giving Mr. Scroggins less than life based upon the testimony of Agent Green in that he used the statements that Mr. Scroggins gave to him as being between 6 and 8 kilograms of *powder* cocaine.
> THE COURT: *Crack* cocaine.
> [Scroggins's Counsel]: No, I believe that he said *powder* cocaine. Now, Mr.—
> THE COURT: I think he said both. I think he said 3 kilograms of *crack*. Was that—
> [Scroggins's Counsel]: Mr. Buchanan testified to *crack*.
> THE COURT: Yes.
> [Scroggins's Counsel]: But not Mr. Scroggins—
> THE COURT: Well, I understand.
> [Scroggins's Counsel]: —in his reports to Agent Green, and I'm asking you to use that as your basis for lowering him below the life sentence range." (emphasis added).

The district court then overruled Scroggins's objection to the amount of crack cocaine and reiterated its finding that Scroggins

---

[58] Green gave essentially the same testimony at trial.

was responsible for at least 1.5 kilograms of *crack* cocaine.[59]

Our review of the record indicates that Green did not testify specifically about crack or powder cocaine; Buchanan was the only source at trial or at the sentencing hearing that gave information about the amount of crack cocaine. We believe that the district court's confusion as to the content of Green's testimony, which was most likely due to a misrepresentation in the addendum to the PSR,[60] likely influenced the district court's conclusion regarding the amount of crack cocaine involved in the conspiracy. If the district court thought that Green's testimony of what Scroggins told him included amounts of crack cocaine over 1.5 kilograms, it would not have been particularly concerned about the differences in Buchanan's information, perhaps explaining why the district court did not attempt to address the differences.

---

[59] 1.5 kilograms of crack cocaine resulted in a minimum (and maximum) guideline sentence of life imprisonment. The next lowest category of crack cocaine volume is .5 to 1 kilogram, under which the guidelines sentencing range would have been 360 months to life.

[60] The PSR concluded that a "conservative best estimate" of the amount of crack cocaine involved was at least three kilograms. Scroggins objected by arguing that that amount of crack cocaine was based entirely on Buchanan's information. The government responded by arguing that Scroggins's own statements to Green that Scroggins had purchased approximately one to two kilograms of cocaine approximately every two weeks for a three- to four-month period corroborated Buchanan's information given to Green. The second time the government referred to Scroggins's statements to Green, it stated that the Scroggins's statement was "just one instance in which [Scroggins] admitted to drug trafficking activities in excess of 1.5 kilograms of *crack* cocaine." (emphasis added). The addendum to the PSR agreed with the government's position.

In spite of the government's claim that Scroggins referred to *crack* cocaine in his statements to Green, we have not found any such reference in the record. Both at trial and at sentencing when Green testified about his conversations with Scroggins, he did not distinguish at all between powder and crack cocaine.

65

Therefore, we remand the case for resentencing with respect to the quantity of crack cocaine (and, should it become relevant, the quantity of powder cocaine).

## Conclusion

Based on the foregoing, we REMAND the case to the district court to consider Scroggins's motion for new trial in the interest of justice (Part I.A.4 hereof above). We also REMAND in order for the district court to review the PSRs of Earl Buchanan and Gregory Byrd to determine whether these PSRs include any material *Brady* or *Giglio* information to which Scroggins was denied access (Part III hereof above). Finally, we VACATE Scroggins's sentence as to the quantity of crack cocaine and REMAND for resentencing not inconsistent with this opinion (Part IV.D hereof above).[61] We reject all other points of error raised by Scroggins and affirm the district court's rulings in the respects challenged.[62]

---

[61] Of course, resentencing would not be appropriate if the district court, pursuant to our remand, first sets aside the conviction.

[62] Scroggins has raised three other issues that we decline to review. Scroggins first raises two arguments that he concedes are foreclosed in this circuit. Scroggins argues that 21 U.S.C. § 841(b)(1)(A) is unconstitutional in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and therefore, that he should have been sentenced in accordance to § 841(b)(1)(C). Scroggins concedes that this argument is foreclosed in this circuit. *See United States v. Slaughter*, 238 F.3d 580 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 2015 (2001); *United States v. Fort*, 248 F.3d 475, 483 (5th Cir.), *cert. denied*, 122 S.Ct. 405 (2001). Scroggins also argues that because he has been sentenced on the basis of thirty times more cocaine base than he was charged with without being afforded a jury finding regarding the amount determined at sentencing, his resulting sentence violates due process. Nevertheless, Scroggins concedes that this argument has been foreclosed in this circuit. *See, e.g.*, *United States v. Keith*, 230 F.3d 784, 786–87 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 1163 (2001); *United States v. Salazar-Flores*, 238 F.3d 672, 673–74 (5th Cir. 2001). As Scroggins raises these arguments merely to preserve Supreme Court review,

66

SENTENCE VACATED

CAUSE REMANDED

---

concedes that they are foreclosed, and does not develop the arguments whatsoever, we do not review these claims.

Scroggins has also filed a supplemental brief in which he claims that under the recent Supreme Court case of *Blakely v. Washington*, No. 02-1632, 2004 WL 1402697 (U.S. June 24, 2004), his sentence is unconstitutional. Although we granted Scroggins's June 29, 2004 motion to file a supplemental brief on the issue, our order doing so states that the order granting the motion does not constitute a determination that any issue raised pursuant to the motion was properly or timely before us. As Scroggins did not raise the issue in his initial brief, reply brief, oral argument, or earlier supplement briefs, but nearly two months after oral arguments, we decline to address this issue now, particularly as Scroggins's argument is foreclosed in this circuit by *United States v. Pineiro*, No. 03-30437 (5th Cir. July 12, 2004), in which we held that *Blakely* does not invalidate the Federal Sentencing Guidelines. Even if we were to review the issue, Scroggins concedes that we would do so under the plain error standard. In light of *Pineiro*, there cannot have been plain error.